

# NUMBER 13-09-00552-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**MADAHAVAN PISHARODI, M.D.,**
**P.A., D/B/A PISHARODI CLINIC,**                                  **Appellant,**

**v.**

**MARIO SALDANA, NANCY LAMAS,**
**AND JESUS LAMAS,**                                              **Appellees.**

---

## On appeal from the 445th District Court
## of Cameron County, Texas.

---

## MEMORANDUM OPINION

## Before Chief Justice Valdez and Justices Yañez and Vela[1]
## Memorandum Opinion by Chief Justice Valdez

---

[1] The Honorable Linda Reyna Yañez, former Justice of this Court, did not participate in this opinion because her term of office expired on December 31, 2010; therefore, this case will be decided by the two remaining justices on the panel. *See* TEX. R. APP. P. 41.1(b) ("After argument, if for any reason a member of the panel cannot participate in deciding a case, the case may be decided by the two remaining justices.").

In this interlocutory appeal, appellant, Madhaven Pisharodi, M.D., P.A. d/b/a Pisharodi Clinic, appeals from the trial court's denial of his motion challenging the expert report and requesting dismissal of a health care liability lawsuit brought by appellees, Mario Saldaña, Nancy Lamas, and Jesus Lamas. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (Vernon 2008). By two issues, Dr. Pisharodi contends that the expert report relied upon facts that do not exist and never identified the proper standard of care.[2] We affirm.

## I. BACKGROUND

Dr. Pisharodi, a neurosurgeon, gave Micaela Lamas an epidural steroid injection in her lower back. Subsequently, Lamas died after suffering cardiac arrest in Dr. Pisharodi's office. Appellees, Lamas's children, filed suit against Dr. Pisharodi claiming that his negligent acts caused Lamas's death. In his answer to appellees' petition, Dr. Pisharodi denied any negligence and claimed that Lamas's death was caused by the intervening acts of Alejandro Betancourt, M.D.

Appellees filed a medical expert report and a supplemental expert report generated by Stephanie S. Jones, M.D., an anesthesiologist. Dr. Jones stated that she reviewed Lamas's autopsy report, Dr. Pisharodi's office notes, the emergency medical services ("EMS") ambulance activity report, and medical records from South Texas Rehab Hospital, Valley Regional Medical Center, and Valley Baptist Hospital.

---

[2] In his brief, Pisharodi generally challenges appellees' expert report because he claims that it "failed to establish that [the patient's] death was caused by any conduct of [Pisharodi]" and it did not include the "causal relationship to the death of the patient." However, Pisharodi has not provided briefing on the issue of causation; therefore, to the extent that Pisharodi attempts to challenge the expert report on the basis that it did not state causation, we are unable to address his issue. *See* TEX. R. APP. P. 38.1(i).

2

In her expert report, Dr. Jones set out that Lamas had been diagnosed with a large L1-2 lumbar disc herniation. According to Dr. Jones, Dr. Pisharodi performed two spinal injections on Lamas. The first time Dr. Pisharodi administered the morphine into Lamas's spine, she did not have an adverse reaction. According to Dr. Jones, Dr. Pisharodi had given Lamas an epidural steroid injection "without fluoroscopy" using a local anesthetic.[3] Dr. Jones stated that Dr. Pisharodi performed the injection in his office "and documented that he injected 5 cc of 0.5% bupivacaine into the neuroaxial region with 4 mg of (presumably) epidural morphine." Dr. Jones noted due to the "amount of local anesthetic and neuroaxial opiates" injected in Lamas's spine, it was outside of the standard of care to perform the procedure in Dr. Pisharodi's office. Dr. Jones stated that after the first spinal injection did not reduce Lamas's pain, Lamas had "spine surgery" but eventually suffered increasing back pain. Dr. Jones stated:

> Dr. Pisharodi felt that [Lamas's] back pain was due to muscle spasms, but in the same sentence also reported that he felt an epidural "pain block" was the cure. In [Dr. Pisharodi's] request for such an injection, he reported that he expected "immediate relief" because he was injecting an "anti-inflammatory" (Depo-Medrol typically takes more than two days to take effect) and "pain medications." Unfortunately, he was given authorization to do this procedure and this was done on October 29, 2007.[4] In the procedure note, he reported that he injected "4 cc of Marcaine and 2 cc of morphine[.]" There is no mention of the strength of the Marcaine or the milligram dosage of the Duramorph. The patient was taken to the recovery area at approximately 10:20 in the morning and reported as being stable. Her vital signs reflected this. At 11:05, she [Lamas] became nauseated, restless and diaphoretic with a recorded blood pressure of 140/88, respirations 22, oxygen saturation 96%. EMS was called at 11:05 and by 11:15 [Lamas] had collapsed without a pulse and CPR was reportedly started. The last recorded vital signs per the

---

[3] Fluoroscopy is "[a]n x-ray procedure that makes it possible to see internal organs in motion." Definition of fluoroscopy, MedicineNet.com, available at http://www.medterms.com/script/main/art.asp?articlekey=3488 (last visited January 11, 2011).

[4] There is nothing in the record stating who gave Dr. Pisharodi authorization to perform the procedure on October 29, 2007.

3

person recording them was 135/90, pulse 90, respirations 24. EMS arrived somewhere around 11:20 in the morning and they documented pupils fixed and un-reactive meiosis due to opiate overdose as well as what they felt to be inadequate bag valve mask ventilation (they were not able to auscultate breath sounds on the patient while the mask ventilation was being done). Fortunately, they intubated the patient and on the way to the hospital, they were able to obtain a cardiac rhythm. [Lamas] was also given atropine and epinephrine. [Lamas] was taken to Valley Regional Medical Center and the admitting diagnosis was anaphylaxis. She developed seizures felt secondary to anoxic brain injury. Dr. Pisharodi was dismissed from care of the patient by the family and her care was taken over by [Dr. Betancourt].

Dr. Jones noted that after several days, Lamas's family allowed the removal of the ventilator, and she died.

Based on the autopsy report, the timing of the spinal injection, Lamas's symptoms, and the EMS's report, Dr. Jones disagreed with the diagnosis of anaphylaxis due to morphine and believed that Lamas suffered an overdose. Dr. Jones opined that "[a]t minimum" fluoroscopic guidance was required for this procedure, and without fluoroscopy, Dr. Pisharodi could not verify that the anesthetic and morphine were not injected into Lamas's spinal fluid. Dr. Jones stated that Dr. Pisharodi was negligent and went outside the standard of care when he performed the procedure with "the amounts of local anesthetic and neur[o]axial opiates that he was giving in his office." Dr. Jones explained that Dr. Pisharodi should have put Lamas on an IV in order to provide adequate resuscitation, if necessary. Dr. Jones stated that she believed that the combination of the medication Dr. Pisharodi injected into the spine, the lack of a fluoroscopy to verify placement of such a large dose of local anesthetic and morphine, and an inability to provide rapid resuscitation led to Lamas's death. Dr. Jones stated:

At MINIMUM these guidelines should have also been applied in the setting in which he placed [Lamas] in accordance with the standard of care.

4

#1)  Monitoring for respiratory depression every 1hr for 12 hrs and then every 2hrs for 12hrs.

#2)  IV access during the time of monitoring to allow for reversal agent administration if necessary.

#3)  Administration of reversal agent (eg Narcan) to all patients experiencing significant respiratory depression after spinal opioid administration.

In her supplemental expert report, Dr. Jones opined that anaphylaxis is not an "appropriate" diagnosis in this case because of the state of Lamas's pupils as documented by EMS personnel.  According to Dr. Jones, the EMS report documented that Lamas's pupils were "fixed and meiotic (i.e., pinpoint in size) and not dilated as you would expect in cardiopulmonary arrest from an allergic reaction.  Opiates cause very small pupils and it is something classically looked for in opiate overdose."  Dr. Jones further stated that Dr. Pisharodi violated the accepted guidelines for administering spinal morphine and that he should not have performed the procedure in his office.

Dr. Pisharodi objected to appellees' expert report and asked the trial court to strike it and dismiss appellees' lawsuit.  The trial court denied Dr. Pisharodi's request.  This interlocutory appeal ensued.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.04(a)(9) (Vernon 2008).

## II.    STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion.  *Valley Baptist Med. Ctr. v. Azua*, 198 S.W.3d 810, 815 (Tex. App.–Corpus Christi 2006, no pet.) (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam)).  A trial court abuses its discretion when it acts "'without reference to any guiding rules or principles' or, stated another way, when the trial court

5

acts in an arbitrary and unreasonable manner." *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985)). We may not substitute our own judgment for that of the trial court when reviewing matters committed to the trial court's discretion. *Bowie*, 79 S.W.3d at 52. A trial court does not abuse its discretion merely because it decides a discretionary matter differently than the appellate court would in a similar circumstance. *Downer*, 701 S.W.2d at 242.

Section 74.351(r)(6) requires that an expert report provide a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the defendant failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon 2005); *Bowie*, 79 S.W.3d at 52; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). An expert report constitutes a good faith effort if it: (1) informs the defendant of the specific conduct the plaintiff has called into question; and (2) provides a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. "The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that [section 74.351(r)(6)] identifies: standard of care, breach, and causal relationship." *Bowie*, 79 S.W.3d at 52. A report merely stating the expert's conclusions about the standard of care, breach, and causation does not represent a good faith effort. *Palacios*, 46 S.W.3d at 879. "'Rather, the expert must explain the basis of his statements to link his conclusions to the facts.'" *Bowie*, 79 S.W.3d at 52 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

6

If, after a hearing, it appears to the trial court that the expert report does not represent an objective good faith effort to comply with subsection 74.351(r)(6), it shall grant a motion challenging the adequacy of the expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *Bowie*, 79 S.W.3d at 51-52. "The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners." *Bowie*, 79 S.W.3d at 52. Furthermore, "a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879.

### III. RELIABILITY OF DR. JONES'S EXPERT REPORT

By his first issue, Dr. Pisharodi contends that Dr. Jones's expert report is inadequate because she relied "upon facts that do not exist." Specifically, Dr. Pisharodi argues that a defendant in a health care liability lawsuit "should be permitted to demonstrate to a trial court that the facts or data upon which a [section] 74.351 report is based are not true and do not exist in order to challenge and strike a report" and that the trial court in this case "should have reviewed the records provided." Dr. Pisharodi urges this Court to review the medical records that Dr. Jones relied on and conclude that the report is insufficient.

We decline to review those medical records. When determining whether a good faith effort has been made, the trial court is limited to the four corners of the report, and it cannot consider extrinsic evidence. *Palacios*, 46 S.W.3d at 878 ("Because the statute focuses on what the report discusses, the only information relevant to the inquiry [of

7

whether the report represents a good faith effort] is within the four corners of the document."); *see also Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 Tex. App. LEXIS 8453, at **19-21 (Tex. App.–Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.) (rejecting the appellant's plea for the appellate court to go outside the four corners of the expert report and review the medical records examined by the expert because the expert report allegedly contradicted the findings in the medical records). Therefore, we must look no further than the four corners of the expert report in order to determine whether Dr. Jones made an objective good faith effort to comply with section 74.351(r)(6). *See Palacios*, 46 S.W.3d at 878; *see also Hernandez*, 2010 Tex. App. LEXIS 8453, at **19-21. Furthermore, the medical records that Dr. Pisharodi urges us to review are not included in the appellate record. Although he has attached these records as appendices to his brief, we cannot consider documents attached to an appellate brief that do not appear in the record. *See Cantu v. Horany*, 195 S.W.3d 867, 870 (Tex. App.–Dallas 2006, no pet.) ("An appellate court cannot consider documents cited in a brief and attached as appendices if they are not formally included in the record on appeal."); *Till v. Thomas*, 10 S.W.3d 730, 733 (Tex. App.–Houston [1st Dist.] 1999, no pet.). We overrule Dr. Pisharodi's first issue.

## IV. STANDARD OF CARE

By his second issue, Dr. Pisharodi contends that the expert report failed to identify the proper standard of care.

In her expert report, Dr. Jones stated that it was outside the standard of care for Dr. Pisharodi to perform the procedure in his office using the amounts of local anesthetic and neuroaxial opiates that he gave Lamas. Dr. Jones stated that "[a]t

8

minimum, anybody who is getting this type of spinal injection should have not only fluoroscopic guidance and contrast injected prior to the medication, but there should be an IV placed regardless of whether IV sedation is used so that adequate resuscitation could be provided if necessary." After reviewing Lamas's medical records, Dr. Jones documented that Dr. Pisharodi did not use fluoroscopic guidance and did not place an IV on Lamas. Dr. Jones concluded that Dr. Pisharodi should have performed the procedure in accordance with "the standard of care per the American Society of Anesthesiology guidelines." She then listed the guidelines that she believed "should have been applied" by Dr. Pisharodi in accordance with the standard of care: (1) there would have been monitoring for respiratory depression for a specified time; (2) IV access would have been established in order to administer a reversal agent if needed; and (3) the reversal agent would have been administered to any patient experiencing significant respiratory depression after spinal opioid administration. Finally, in her supplemental expert report, Dr. Jones opined that Lamas's death was caused by an overdose of spinal morphine causing cardiopulmonary arrest that was not properly treated, which led to anoxic brain injury.

An expert report must "set out what care was expected, but not given." *Palacios*, 46 S.W.3d at 880. In this case, Dr. Jones's report informed Dr. Pisharodi that the proper standard of care when performing a spinal injection of local anesthetic and opiates required him to utilize fluoroscopic guidance, provide an IV for Lamas, and adequately treat Lamas's adverse reaction to the medication. "[M]agical words" are not needed to provide a fair summary of the standard of care. *See Bowie*, 79 S.W.3d at 53. Moreover, in determining whether the expert complied with the statute, we consider the

9

"substance of the opinions, not the technical words used." *Moore v. Sutherland*, 107 S.W.3d 786, 790 (Tex. App.–Texarkana 2003, pet. denied). Here, the expert report provided the substance of Dr. Jones's opinions and gave a basis for the trial court to conclude that the appellees' claims have merit. *See Palacios*, 46 S.W.3d at 879. Therefore, we conclude that the trial court did not abuse its discretion by denying Dr. Pisharodi's motion to strike appellees' expert report. *Valley Baptist Med. Ctr.*, 198 S.W.3d at 815. We overrule Dr. Pisharodi's second issue.

## V. CONCLUSION

We affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
27th day of January, 2011.